**WEBER et al.  v.  McKEE et al.**

No. 14707.

United States Court of Appeals, Fifth Circuit.

Aug. 25, 1954.

448

Ralph W. Currie, Dallas, Tex., for appellant.

Paul Carrington and Carrington, Gowan, Johnson & Walker, Dallas, Tex., Frank G. Newman, Dallas, Tex., of counsel, for appellees.

Before STRUM, Circuit Judge, and DAWKINS and HOOPER, District Judges.

HOOPER, District Judge.

Appellees H. K. McKee and others[1] brought an action against Frank B. Weber to recover unpaid balance upon the agreed purchase price for shares of capital stock of Missouri-Oklahoma Express, Inc., a Missouri corporation, sold by plaintiffs to said defendant. L. R. Strickland, who executed guarantee of payment, was joined as a defendant.

Appellants Weber and Strickland filed answers admitting the sale and the contract of sale, but denying liability upon the ground of alleged fraud and misrepresentation in connection therewith.

Defendant Strickland by way of counter-claim sought to recover back the sum of $55,000.00 which he had paid as purchase price under the contract, and other sums which he had advanced to the cor-

[1.] Plaintiffs were H. K. McKee, Fred W. Dolson, Jr., W. A. Heider, Earl G. Gibson, F. C. Woolridge, Harry A. Morris, Searcy T. Henson, and Linwood State Bank (as transferee from some of the plaintiffs).

poration after the sale. The trial judge entered judgment against defendant as prayed, ruling that Strickland's counterclaim was not only filed too late but was also without merit. Both defendants appealed to this court.

1. Appellants contend the judgment was not authorized by the evidence in the case. With this we do not agree. While in many respects the testimony was in sharp conflict, the testimony in the case is ample to show the following facts:

Defendant Strickland, who was then operating another transportation line, became interested in purchasing the stock of this company. He "did not want some other people to acquire it," but could not acquire it at that time himself, and suggested that the stock be bought in the name of Weber. After considerable negotiations the parties entered into a contract of sale dated October 31, 1950, the material portions of which will be referred to below.

The contract contained a representation and warranty that the liabilities of the corporation were no greater in the aggregate than revealed by a balance sheet dated August 31, 1950 which was furnished by sellers to purchasers.

The contract also guaranteed that the assets shown on said balance sheet did actually exist, were owned by the corporation, and were subject to no liens and encumbrances other than those revealed by books of the corporation, and as included in said balance sheet.[2]

The contract further provided that should it be determined that the liabilities were greater than represented, purchaser should have the right to discharge said excess liability by paying same out of the deferred installments and crediting the purchase price accordingly. Should it be found that any of the assets did not actually exist, purchasers might deduct from any installment "an amount equal to the depreciated book value of said nonexistent asset." The

contract provided that in the event the purchaser determined to exercise any of the rights or privileges above stated he should, as a condition precedent, notify sellers, and they were to have the right to defend at their own expense any such claimed liability. In case of a non-existent asset sellers were to be given a reasonable time in which to find and restore said missing asset.

We will give a brief outline of the charges of fraud contended for by defendants and seek to point out why, in our opinion, findings of the trial court against the existence of fraud were fully authorized by the evidence.

Defendants in their answer allege false representations to the effect "that the books of the corporation were kept in accordance with the regulations of the Interstate Commerce Commission, particularly with respect to showing value of assets on the basis of costs less depreciation," and that plaintiff presented to defendants a balance sheet dated August 31, 1950, bearing account numbers prescribed by the Interstate Commerce Commission, without revealing that plaintiffs had arbitrarily increased the book value of the physical assets.

As to whether such representations were made there is sharp conflict, but the court was amply justified, having the opportunity to observe the witnesses on the witness stand, to believe several witnesses produced by plaintiffs who were present during these negotiations.

Evidence was produced by plaintiffs that in February, 1950, before this contract was executed, the company had received a loan of $70,000.00 from Reconstruction Finance Company in connection with which an appraisal was made of the company's equipment. While it appears that the Interstate Commerce Commission did require generally that equipment be carried on the books of the company at its cost price, less twenty-five per cent depreciation per an-

2. Defendants contended one Johnson held a lien on the operating rights. Johnson's claim was listed as a liability, and the paper purporting to give the lien was exhibited to purchasers before the sale. See Record, page 165.

num, that rule was not invariable, and in this instance Reconstruction Finance Company had required the company, in order to obtain the loan, to carry this equipment on its books at its fair market value as shown by appraisal made by agent of the Reconstruction Finance Company.

The matter of value of assets was fully discussed before the contract was signed. Defendants requested plaintiffs to guarantee the value of the assets and plaintiffs not only declined to do so but insisted that a clause be inserted in the contract to provide for errors as to assets or liabilities. Defendant Strickland, with twenty-five years experience in dealing with this type of equipment, apparently had full opportunity to inspect the same and was satisfied with its values. He continued to use the equipment and to make payments on the same for more than ten months after taking over the company. During that period of time in June, 1951, he discovered, if he did not know before, the manner in which this equipment was carried on the books of the company.[3] When he declined to pay the note due in October, 1951 he made no complaint as to fraud or misrepresentation as to this item or any other.

Another item of fraud claimed by defendants in their amended answer was the alleged misrepresentation that the corporation was solvent, and closely akin thereto was another one, to the effect that the financial condition of the company when the sale was made on October 31, 1950, was as good as was shown on a balance sheet of August 31, 1950.

■■ The court having opportunity to observe the witnesses, was authorized to find that these representations also, were not made, and was further authorized to find, even though some errors might have been contained in the statement of August 31, 1950, they would not be sufficient to justify a rescission of the sale, particularly in view of the provisions of the contract to make adjustments therefor.

As to representations of solvency of the company, it would seem they were made. If not made expressly they were made impliedly by plaintiffs by furnishing to defendants a balance sheet which showed the company to be solvent. This balance sheet of August 31, 1950, however, carried the operating rights of the company at only $16,723.95. Defendant Strickland himself testified that these rights were worth to him the sum of $110,000.00 and that, in subsequently making application to the Interstate Commerce Commission, he had represented them to be worth in excess of $110,000.00. It also appears that some months after this sale there was a firm offer of $75,000.00 made for the operating rights. It also appeared that another company interested in buying this company placed a valuation on said rights of $75,000.00. Therefore, the court was authorized to increase the assets shown on the statement by a considerable sum.

It is true that defendants sought, as against the above, to show existence of liabilities of the company in excess of those contained on the above balance sheet. To review the testimony as to each of these items would unduly prolong this opinion. Suffice it to say, we have read and reread the briefs of counsel, and have carefully checked contentions of counsel against the facts in the record, and have concluded that the evidence did not demand a finding as contended by defendants.[4] However, should it appear that there were discrepancies as to assets or liabilities, they were contemplated by the parties to the contract, and express provisions were contained in the contract as to adjustments for the same. De-

3. There was ample evidence to the effect these facts were made known to defendants prior to the sale. See testimony of plaintiff McKee, page 162 of the Record.

4. Defendant's witness Swinson (Record, page 101, et seq.) prepared a balance sheet purporting to show condition of the company as of October 31, 1950. His conclusions as to the financial condition of the company were based in large part on hearsay. As to many items his conclusions were clearly unfounded.

fendants never gave notice to plaintiffs of any contentions as to absence of assets or excess of liabilities, nor make any request as to adjustment for the same. On the other hand, they retained the company for a long period of time after the sale, made regular monthly payments on the purchase price without claiming fraud, and not until it appeared that defendant Strickland would be unable to effectuate a desired transfer of the operating rights did any contention arise as to fraud upon the part of the plaintiffs.[5]

2. Appellants allege that "the findings of the trial court are in violation of Rule 52 of the Federal Rules of Civil Procedure, 28 U.S.C.A. because they do not indicate the factual bases for the ultimate conclusions expressed by the trial court." In their brief they allege that a mere finding of "no fraud" is not sufficient, that the court should have made specific findings as to defendants' contentions concerning the assets of the company, the method of keeping books, the mortgage against the operating rights and the absence of assets.

The Findings of Fact by the court, consisting of two full pages in the record, review the steps taken in the case, makes finding as to sale of stock, the payments, the default, the making of the contract, and other things. Then comes the following: "I find that there was, and, is no fraud on the part of the sellers; that the whole claim that the representation was made of solvency, when, as a matter of fact, the concern was insolvent, is not a fact." Then follows the explanation that, in estimating solvency, the value of the certificate referred to heretofore was part of the assets.

While the above portion of the findings is to some extent vague and incomplete we construe it in light of the record, to mean that the court was finding absence of misrepresentations by plaintiff on all matters claimed except as to solvency, and that, as to solvency, the falsity of

the representation was not shown. Such a finding is consistent with the evidence, for it does appear the plaintiffs virtually represented solvency by displaying a balance sheet which showed solvency.

■ A finding that the company was solvent is sufficient. The assets and liabilities going to illustrate solvency, of course, need not be stated.

■ As to fraud, a finding that fraudulent misrepresentations were not made as alleged would be sufficient, without referring to each separate representation and making subsidiary findings as to the same.

■ We agree that it would have been better had these findings been more full. "Although more specific findings of fact upon these issues would have been helpful and appropriate, a failure to make them does not constitute reversible error." Ginsberg v. Royal Ins. Co., 5 Cir., 179 F.2d 152, 153. The general rule has been thus stated:

"The federal rule relating to findings of the trial court does not require the court to make findings on all facts presented or to make detailed evidentiary findings; if the findings are sufficient to support the ultimate conclusion of the court they are sufficient. * * * Nor is it necessary that the trial court make findings asserting the negative of each issue of fact raised. * * * The ultimate test as to the adequacy of findings will always be whether they are sufficiently comprehensive and pertinent to the issues to provide a basis for decision and whether they are supported by the evidence." Carr v. Yokohama Specie Bank, Limited, 9 Cir., 200 F.2d 251, at page 255.

As to whether Findings of Fact are sufficient depends of course, upon the particular facts of each individual case and no general rule can govern. Had the trial court found that fraud did exist, no

---

5. Plaintiffs do not contend defendants waived their right to rescind by failing to do so promptly upon discovery of the alleged fraud, but see 77 C.J.S., Sales, § 40, at page 668; also § 68 at page 723.

doubt the court would have specified the misrepresentations, their falsity, and that complainant was misled. Having found, however, that misrepresentations were not made, a finding to that effect was sufficient.

We could have disposed of this case by ruling simply that the trial judge was justified in finding that representations were not made. We did not do so, however, but went into the evidence to determine whether, if the representations were made, they were true or false, and we find that the evidence was sufficient to show that if made, the representations were nevertheless true.

3. Appellants contend the court erred in refusing "to permit appellants to testify as to the facts and circumstances by which the appellees induced them to execute the contract, though it varied in terms from the substance to which, in reality, they were consenting."

This assignment of error has reference to ruling by the court when defendant Strickland was on the witness stand. His counsel questioned him as to why he did not insist at the time the contract was executed that certain statements by the plaintiffs be written into the contract. The court then inquired of counsel: "Are you trying to vary your contract?" Counsel responded: "Yes sir." Then followed further colloquy, at the end of which the court declined to hear such testimony. Defense counsel said "All right, sir" and did not state for the record what answer he expected of the witness.

 The ruling of the court does not constitute reversible error. The defense offered to this contract was fraud, and defendants were permitted to introduce all the testimony they desired upon that defense. The reformation of the contract for fraud, accident or mistake was not involved.

4. Appellants contend that "the court erred in construing the contract of purchase in that the court held in the case of a non-existent asset, or an excess of liabilities over that stated, the appellants were restricted to the remedies specified in the contract." In our opinion the court's interpretation of the contract was proper, but there is some doubt whether an interpretation of the contract was relevant or necessary. Defendants stood squarely upon their right to rescind the contract for fraud, they sought no remedies under the contract, consequently its interpretation is not of controlling importance.

5. Appellants contend the court erred in concluding that defendant Strickland's counter-claim was filed too late and also that it was without merit. Since the counter-claim was based entirely upon defendants' right to rescind for fraud, and since there was no fraud, the counter-claim was without merit, and no error was committed in connection therewith.

The evidence authorized the judgment, no reversible error of law appears and the judgment is affirmed.

(Judge STRUM participated in the hearing and decision of this cause, but died before the opinion was filed.)